## In re Blumenthal and Verlin.

*Attorneys—Disbarment—Discretion.*

A rule for disbarment of two attorneys will be made absolute where it appears the attorneys secured the release on bail of a witness for the Commonwealth in a prosecution wherein they represented the defendant, advised the witness that she leave the jurisdiction so as not to appear at the district attorney's office to prepare the case against their client, falsely told the district attorney that they did not know where the witness could be found, arranged for her marriage to defendant and advised the making of a false affidavit as to her age, so that a license could be obtained without the consent of her parents.

Rule for disbarment. C. P. No. 2, Phila. Co., June T., 1928, No. 7993.

*L. B. Schofield,* Assistant District Attorney, acting as *amicus curiæ,* at the request of the Court, for the rule.

*Benjamin M. Golder,* for respondents.

GORDON, JR., J., July 24, 1928.—This is a rule for disbarment, entered by us, on our own motion, because of disclosures of the professional misconduct of these respondents, which came to our attention while sitting in the criminal court. The evidence taken on the hearing of the rule establishes the following facts:

Indictments for pandering and being a male bawd were found against one George Snyder, as of May Sessions, 1928, Nos. 741 and 742, and in those indictments Josephine Colvin, otherwise known as Josephine Snyder, was the nominal prosecutrix and a vital witness for the Commonwealth. One of the respondents, S. Richard Blumenthal, represented Snyder in the criminal proceedings, and the other respondent, Morris Verlin, is and was associated with Blumenthal in the practice of the law. It is unnecessary to review at length the facts of the cases against Snyder, which have not yet been tried. It will be sufficient to state that the Colvin girl was sixteen years old in February of this year, and came to this city from her home in the South some time in the year 1927, when she was fifteen years old; and that the charge of pandering arose out of Snyder's alleged activities in keeping this infant in a house of prostitution and receiving her earnings therefrom. Blumenthal not only knew these facts in his capacity as attorney for Snyder, but, as will be shown later, was also specially warned that the girl was a minor, just past sixteen years of age, and was a Commonwealth's witness in the matter.

Judge Gorman, who heard the case at the preliminary hearing in the Municipal Court, desiring to protect the girl while here, and to return her to her parents in the South when the trial was ended, held her as a material

witness against Snyder, and committed her to the custody of the Morals Court without bail.

The indictments, already mentioned, having been secured by the Commonwealth, the case was listed for trial on Tuesday, June 26, 1928. On the preceding Monday or Tuesday, June 18th or 19th, the respondent, Verlin, appeared at the District Attorney's office and interviewed Miss Mary Y. Van Gilder, who has charge of the listing of cases for trial. When asked his interest in the case, Verlin said that he represented the Snyder or Colvin girl, and wanted to know why she was being detained at Twelfth and Wood Streets, the Morals Court. Miss Van Gilder then reminded Verlin that the girl was only sixteen years old, and warned him that it would be doing her an injury to procure her release and return to immoral practices. To this, he replied that he was not so much interested in getting her out; it was "the other lawyer," referring to his partner, Blumenthal, who represented Snyder. Verlin thus disclosed that he had intruded himself, at the instigation of his partner, in the representation of this adverse witness, whose interests conflicted with those of a client of the partnership; that he did not intend faithfully to represent her; that his conduct was the product of a conspiracy between the partners; and that he knew the interests of the Commonwealth and the person whom he was pretending to represent would be injured by securing her release on bail.

In the face of this warning and this knowledge, Verlin immediately secured a writ of *habeas corpus* for the girl, and on Wednesday, June 20th, she was released in the Quarter Sessions Court in $1000 bail for her appearance on the following Tuesday as a witness at the trial. From the court-room, the girl was taken by Verlin to his office, where she was turned over to Snyder, who took her to a hotel at Tenth and Pine Streets. Snyder and the girl lived together at this hotel on Wednesday and Thursday nights. On Friday morning, at Broad and Market Streets, they met Verlin, who informed them that the District Attorney's office was looking for them, and had sent for him, and he advised them to leave the jurisdiction. Snyder then took the girl to New York City, where they stayed until Monday morning.

In the meantime, Verlin went to the District Attorney's office on Friday, after warning Snyder to get out of town with the girl, and saw Assistant District Attorney Franklin E. Barr, who had charge of the prosecution of Snyder, and was seeking Miss Colvin to prepare the case for trial. At that interview, Verlin falsely told Mr. Barr that he did not know where the girl was, that he had been unable to find Snyder to locate her, and, in substance, refused to produce her for examination by the District Attorney.

On the following Saturday, June 23rd, District Attorney Monaghan sent for the respondent, Blumenthal. He asked Blumenthal whether he represented Snyder, to which Blumenthal answered that he did—"It is a case in our office." The District Attorney then told Blumenthal that it had come to his attention that he and his partner, Verlin, were planning to marry the Colvin girl to their client, reminded him that Snyder had put the child, when she was under sixteen years of age, "out on the street," and warned him that he and Verlin were doing wrong, and denounced their conduct as indecent. Blumenthal replied that he would try his cases to suit himself, and was then ordered out of the District Attorney's office.

On Monday morning, June 25th, Snyder brought Miss Colvin back from New York to Philadelphia, and together they went to a barber shop on Oregon Avenue. At Snyder's direction, the girl called Verlin's office on the telephone. Blumenthal answered, and, when told where they were, directed

her to wait there, saying that he would be there immediately. When this telephone conversation took place, David Mallace, Snyder's bondsman, was in Blumenthal's office, as he had received a notice to produce Snyder in court on that day. He heard Blumenthal's end of the conversation, and, on the latter's invitation, went with him to meet Snyder and the girl. As they were leaving the office, Blumenthal asked Mallace to tell Snyder that "the best thing for them to do is to get married; it will ease them up on the case." When Mallace communicated this suggestion to Snyder, the latter said: "I know all about it; I want to marry her myself; I was thinking of that coming along."

Having in this manner advised his client to marry the child whom he had debauched and wronged, Snyder and his attorney, Blumenthal, then took her, accompanied by Mallace, who was only interested in the matter to the extent of complying with the notice to produce the defendant in court, to City Hall, to secure a marriage license; and, on the way down, the two conspirators instructed the girl to give a false date for her birth in the application for a marriage license, so as to make it appear that she was over twenty-one years old. They thus suborned the perjury which she committed in that connection. After securing the license, Blumenthal took Snyder and the girl to a magistrate, who married them.

The foregoing facts tell a tale of professional misconduct and dishonor that may be safely asserted to be without parallel in the history of our bar; for the many unethical and criminal acts which these attorneys committed were not merely thoughtless mistakes of zeal and judgment; they were deliberately done in the face of repeated warnings from a number of sources, and in a callous and brutal disregard of the demands of common decency and honor. A child of tender years, away from her home, who, in her impulsive failings, peculiarly needed spiritual and moral guidance and protection, and who had been maintained in a life of shame and degradation by a conscienceless panderer, had been rescued by the agencies of the law and was safe under its humane protection. From this harbor of refuge that child was snatched by the criminal acts of these attorneys, and her life further blasted by linking her in the marriage state with her unclean corrupter. All this was done by them by abusing their official powers, in an effort to obstruct and defeat the justice which they were sworn to uphold, and, by misuse of legal processes, to close the mouth of a witness for the Commonwealth, and thus to cheat it of its rights. Such conduct by an attorney discloses a complete want of character and an unfitness for the high privileges of the office. This perversion to base and unmanly uses of the machinery of the law makes it necessary for us to vindicate the honor of the bar by purging it of such unworthy members.

The conduct of the respondents cannot be justified in any step that they took. Everything that they did in their representation of Snyder was in violation of the plain canons of professional ethics. Instead of preparing their client's defense according to the truth, as was their right and duty, they sought to stifle the facts and hide the truth by tampering with a witness for the Commonwealth in a manner unusually bold and audacious, in view of the immaturity of the victim of their scheming. To have merely dissuaded the witness from testifying, or to have procured her to leave the jurisdiction, would have been criminal in any one. For attorneys to plot, as these did, to accomplish the same purpose by the methods here used was a breach of their oath of fidelity to the court, of which they are officers, and to the law, for whose pure administration they are responsible in all matters with which they have to deal. The license of an attorney confers no authority upon him

In re Blumenthal and Verlin.

to resort to sharp practices or dishonorable or deceitful conduct to defeat justice, or, by legal chicanery, to secure for the client that to which, in law and in morals, he is not entitled. This is evident. It is equally evident that even an undoubted right cannot be sought for a client by like means. To win at all costs is not, and has never been, the standard of the bar. And it never shall be, for the day it becomes so, the usefulness of the profession in the social structure will disappear.

It is no justification for the marriage of this child that she had expressed a willingness, or even desire, to marry the man who had corrupted her, or that in somewhat similar circumstances marriages have been permitted. She is a child incapable, unaided, of understanding her own interests, and forbidden by public policy to contract a marriage without parental consent. A wrong done secretly and hostilely is not cured merely because it might not be wrong if done openly and by agreement.

Another important feature of the misconduct of these respondents is in their hiding of the witness from the Commonwealth's officers between the time she was released on bail and the following Monday, when she was married. This was a serious and unwarranted interference with the rights of their opponents and a grave obstruction of public justice. It is true that the legislature has not seen fit to give to the District Attorney the power of subpœna to compel Commonwealth's witnesses to come to his office, and no punishment can, therefore, be inflicted upon one who refuses to answer such a summons. But the withholding of that power is in no sense a denial of his right to have access to his witnesses in the preparation of his cases. It is the duty of the citizen to aid the prosecuting officer of the State in every way that he can, consistent with his reasonable rights; to go to the prosecutor's office, when invited, and to make full and frank disclosure to him of all things of which he may have knowledge touching the public interest. This is a public duty resting upon all; and he who seeks to dissuade another from performing it wrongs the State. For an attorney, who is charged with special knowledge in such matters, actively to conceal a witness from the Commonwealth, or to endeavor, directly or indirectly, to dissuade a citizen from fully performing this duty, is gross misconduct, for which he is subject to discipline or to disbarment, according to the gravity and extent of his offending.

Other aspects, in which the conduct of these respondents is to be condemned, might be mentioned, as, for instance, the suborning of the perjury of the woman by Blumenthal in connection with the application for a marriage license, and the professional betrayal by Verlin of the interests of a client on whom he had thrust his pretended services as attorney. But we do not deem it necessary to comment upon their misbehavior in further detail. Their conduct, as a whole, was in every way indefensible, and shows a blunted sense of their professional obligations and an utter want of that moral character which is so essential to the proper performance of his functions by an attorney. If we were to permit them to continue longer as attorneys of the court, we would be falsely holding them out to the public as worthy of trust and confidence, and would work a wrong to the bar, whose ethical standards and traditions they have deliberately and shamelessly betrayed.

The rule to show cause why the respondents should not be disbarred is, therefore, made absolute, and the prothonotary is directed to strike from the roll of attorneys of the court the names of S. Richard Blumenthal and Morris Verlin, and to give notice of this action to the Orphans' Court of Philadelphia County and to the Supreme and Superior Courts of Pennsylvania.